## Case No. 8,969.

### MAHONY MIN. CO. v. BENNETT.

[5 Sawy. 141; 6 Reporter, 99.] [1]

Circuit Court, D. California. April 22, 1878.

CORPORATIONS—BOARD OF DIRECTORS—FRAUDULENT LEASE OF A MINE.

Where a board of directors of a mining corporation makes a nominal lease of the mine owned by the corporation, to a party really acting in the interests of a minority of the stockholders, not in the ordinary course of the business of the corporation, but for the purpose of withdrawing the mine from the control of a board of directors about to be elected at an approaching meeting of the stockholders, and thereby perpetuating the control of the minority, a court of equity will cancel the lease on a bill filed by the corporation for that purpose.

Bill in equity [by Mahony Mining Company against Samuel Bennett] to set aside a lease on the ground of fraud. [For a former hear-

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 6 Reporter, 99, gives only a partial report.]

ing on a motion for leave to file record in the case and for a preliminary restraining order, see Case No. 8,968.]

McAllisters & Bergin and Stewart, Van Clief & Herrin, for complainants.
S. Heydenfeldt and Wm. H. Sharp, for defendant.

SAWYER, Circuit Judge. This case was argued very thoroughly, and the testimony was very fully read on the hearing. It is a bill in chancery to set aside a lease of a mine for three years, with an option to purchase at the price of two hundred and fifty thousand dollars within that period. The ground alleged is that this lease was made, not in the due and proper course of the business of the corporation, but by a conspiracy, in fraud of the rights of the majority, and in the interest of the minority, of the stockholders. The bill is filed to cancel the lease on that ground.

Testimony has been introduced and arguments have been made with reference to the irregularity of the election of both the boards of directors claiming to represent the corporation; but I do not find it necessary, in the view I take of the case, to decide as to the ultimate validity of those elections; and I shall assume, for the purposes of the decision, that the election of the first board of directors, by whom the lease was made, was valid. The result of that election is only important, in the view I take, so far as it bears upon the question as to the purpose for which this lease was made. There are certainly some irregularities in it, and some extraordinary circumstances connected with that transaction. Nevertheless, I shall consider those in this case only as indicating the motives of the actors, and their bearing upon the validity, or legal propriety, of this lease.

The mine seems to have been worked without any difficulty up to a certain time in April, 1877. The two principal stockholders owned fifty-two hundred shares each, and there were sixteen hundred shares outstanding, belonging to Sharon, Bell, Sunderland and Flood & O'Brien. One of the directors—the director who, as I understand it, represented the interests of Sharon, Bell, Sunderland and Flood & O'Brien—resigned; and the remaining directors called a meeting of the stockholders for the purpose of electing a new board of directors. This meeting was called apparently in the interests of the Seligmans—one of the two large stockholders. The other large stockholder, Stewart, owning an equal number of shares with the Seligmans, was at the time temporarily absent on business in New York, and was not notified of the calling of the meeting of the stockholders. A thousand shares of the stock of the company, owned by Sharon, Bell and Flood & O'Brien, stood in the name of one Bush, as trustee, and were voted at that meeting by him without the knowledge or

consent of the owners, who were in the city at the time; and neither Sharon nor Bell was aware that his stock had ever been issued, and neither had notice of the calling of the meeting. These shares were required to constitute a majority of the stock.

At that meeting a new board of directors was elected, most of them, apparently, being merely nominal owners of stock, holding a few shares in order to qualify them to act as directors. The meeting seems to have been organized, and the new directors elected, under the management of Benjamin, acting in the interest of the Seligmans; at all events these directors were elected to control the corporation; and, for the purposes of this decision, I shall assume that they had authority to act as directors in the usual business of the corporation.

When Stewart returned to the city within a few days after, and ascertained what had been done, there was dissatisfaction, and some discussion over the matter. Previous to this time there had been no meeting of the stockholders or election of directors since the first board was elected, three or four years before; and, as the by-laws of the corporation contained no provision for the calling of an annual meeting, the statute provides that, in such a case, the time of meeting shall be the first Tuesday in June. Civ. Code, § 302. In case no meeting is called by the board at the time appointed by law, one half of the stockholders are authorized to call one. Id. §§ 310, 314. The extraordinary meeting was held on May 1, a few days only over a month prior to the time appointed by the statute for the annual meeting. Stewart, upon ascertaining the condition of things—that the one thousand shares of Sharon and Bell and others had been voted without their knowledge and consent—bought up these outstanding shares before the first of June, and immediately notified all the stockholders and the directors of the calling of a stockholders' meeting in June, in the mode designated by the statute. Immediately on receiving that notice, the directors elected on the first of May met, on the first of June, and, without having previously had any consultation in regard to the matter, Benjamin, representing the Seligmans, being the active party, it was proposed to make a lease of the property to one Bennett, a brother-in-law of Benjamin; and the board passed a resolution authorizing the making of the lease, and the lease was thereupon made, the lease in question here. All this was accomplished before and on the fifth of June.

Now the question is as to the purpose of that lease. It is claimed on the one side that it was made in good faith, in the interest of all the stockholders; and on the other side it is claimed that it is a mere sham, gotten up for the purpose of keeping the control of the mine from passing into the hands of the majority of the stockholders in case they should elect a new board of directors at the

meeting called in June. It is admitted by the principal witnesses, and by the ones particularly active in the matter, that that was one of the purposes of the lease. It is so stated in their testimony, and I think no one can read that testimony without being satisfied that that was the moving and controlling purpose of this lease. It is very manifest, to my mind, that Bennett was not the real lessee, but was a mere instrument in the hands of Benjamin, acting in the interest of the minority of the stockholders at that time. Bennett was a man not likely to take such a lease, having no sufficient means with which to carry on such an undertaking, and not being a man of experience in mining, or a person whom business men of ordinary judgment and prudence would be likely to entrust with such an enterprise. From the testimony, it appears manifest to my mind that the money paid out by him, after assuming control of the mine, was furnished by other parties, and not by Bennett; that Benjamin was still the active and controlling man as before. It is impossible, it seems to me, after reading the testimony in the case, to come to the conclusion that the transaction was really a bona fide lease to Bennett, for his own purposes. Bennett was but the instrument, the shadow of the real parties seeking to withdraw the control of the mine from the board of directors about to be elected by the majority of the stockholders.

Now, it may well be, that, in making such a lease, the parties, representing the minority, may have believed that the interest of all the stockholders was advanced; but in this case, where this lease is given with an option to purchase the mine for two hundred and fifty thousand dollars, it is certainly a remarkable fact that the man who was active in the matter should have been Benjamin, both before and after the lease. Manifestly, the controlling purpose was to circumvent the other stockholders, who were seeking, at the proper time and in the mode appointed by the statute, to elect a new board of directors, and to put the mine beyond their reach and control, in order that the Seligmans might control it according to their own ideas of what was right and proper. Whether or not this was, as the complainant insists, intended as a fraud, the manifest operation of the proceeding, if consummated, would be to work a fraud upon the rights of a majority of the stockholders. Upon that ground I think the lease was not made in the due and regular course of business of the corporation, or for any legitimate purpose. It was made for the purpose of diverting the mine into the control of the minority of the stockholders, against the opposition of the majority, without any representation on the part of the majority, in case the majority should succeed in establishing their control of the corporation—should elect a new board of directors at the coming meeting.

It is said that this new election was void,

and that the acts of the new board of directors are not the acts of the corporation. The new board was elected by a majority of the stockholders at a meeting held at a time and in the manner authorized by law, and a state court has decided that election to be valid; and, although there is an appeal pending, that judgment is still unreversed. At all events, the new board is in active control, and, as I understand it, in possession of the books. etc., of the corporation; and its members are now, and were at the time, de facto, acting as directors.

As to the management of the mine, we have nothing to do with that here. Upon the vacation of the lease the mine, as it should be. will be subject to the control of the legal board of directors, whoever they may be. The new members were doubtless all elected in the interest of those opposed to the Seligmans, as the old ones were in their favor. But we have nothing to do with that in this suit. I have disposed of the only question involved in the case in determining that this lease was made for an unlawful purpose— for the purpose of taking the mine out of the control of those who were to succeed in the management of the mine, should an election be lawfully held, in pursuance of notice already given: a purpose which, in my judgment, renders the lease an unlawful exercise of the powers assumed and exercised by those parties by whom it was made, and therefore that it should be canceled.

Let a decree be entered canceling the lease, in pursuance of the prayer of the bill, and making the preliminary injunction issued perpetual.